**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

RODNEY G. BROWN,       )
                                 )
       **Plaintiff,**        )
                                 )
**v.**                            )
                                 )  **Case No. 2:16-cv-1435-RDP**
SHELBY COUNTY BOARD OF      )
EDUCATION, et al.,           )
                                 )
       **Defendants.**      )
                                 )

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendants' Motion for Summary Judgment. (Doc. # 20). The parties have fully briefed the Motion (Docs. # 21, 23, 26), and it is under submission. After careful review, and for the reasons explained below, the court concludes that Defendants' Motion for Summary Judgment is due to be granted in part and denied in part.

**I.    Factual Background[1]**

This employment discrimination and retaliation action concerns four hiring decisions[2] made by Defendant Shelby County Board of Education.[3] Plaintiff Rodney Brown applied for all four positions and interviewed for one of them, but he was not selected for any of the positions.

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Plaintiff initially complained about a fifth hiring decision involving a special education teacher position at Montevallo High School. But Plaintiff has since conceded that, because he had not applied for this position at the time the hiring decision was made, he cannot make out a prima facie case of discrimination based on that hiring decision. (Doc. # 23 at 9, ¶ 41). Accordingly, the court addresses only the other four hiring decisions.

[3] Plaintiff also sued the individual Board members and Superintendent Randy Fuller. As explained below, however, Plaintiff has abandoned his claims against the individual defendants.

He claims the Board's failure to hire him was because of his race and age, and in retaliation for his prior complaints of discrimination. The court begins its review of the facts by discussing the Rule 56 record regarding Plaintiff's work history and qualifications. The court then reviews the Board's hiring procedures and describes each of the Board's four hiring decisions in turn.

### A. Plaintiff's Work History and Qualifications

Plaintiff is an African American male, aged 53, who is a lifetime resident of Shelby County, Alabama. (Doc. # 24-4 at ¶ 2). He worked in the Shelby County Schools ("SCS") for approximately 13 years, first as a paraprofessional and then as a special education teacher. (*Id.*). Prior to joining SCS, Plaintiff spent nine years working with at-risk children and adults as a case manager at the Chilton-Shelby Mental Health Center. (*Id.* at ¶ 3).

SCS hired Plaintiff in 1999 as a substitute teacher at Thompson High School in Alabaster, Alabama. (*Id.*). At that time, he had a bachelor's degree in business administration. (Doc. # 22-1 at 68). In 2001, SCS hired Plaintiff into a special education position at Thompson High School to work one-on-one with emotionally disturbed children. (Doc. # 24-4 at ¶ 4). SCS initially hired Plaintiff under an emergency certificate, which Plaintiff has testified is required when a teacher has not yet been certified to teach special education by the Alabama State Department of Education. (*Id.* at ¶¶ 4, 11-13). In 2002, Plaintiff received an alternative certification which permitted him to serve as a collaborative special education teacher while he continued to pursue his special education certification with the State. (*Id.* at ¶ 4). During his time at Thompson, Plaintiff eventually became certified to teach special education in Alabama, earned his master's of education in special education, and earned a professional certification in education administration. (*Id.* at ¶ 4; Doc. # 22-1 at 68). But he did not hold any formal leadership or administrative positions while at Thompson (Doc. # 22-1 at 68-69), at least in part

because leadership opportunities were available only by invitation of the principal, and Plaintiff was never invited to participate in any leadership or coaching opportunities. (Doc. # 24-4 at ¶ 5). Plaintiff's resume in 2015 did, however, list the following experiences under the heading "Leadership": Mentor Teacher (2006-2008), ED Self-Contained Teacher Leader (2001-2005), Academic Tutoring (2008-2009), Homebound Instruction (2008-2013), and Student Recognition Team (2013-2014). (Doc. # 24-6 at 1). Plaintiff remained at Thompson High School as a special education teacher until August 2016.[4] (Doc. # 22-4 at ¶ 7).

In August 2016, Plaintiff left Thompson High School and began working for the Midfield City Schools (schools not affiliated with SCS) as a special education teacher for middle school students grades five through eight. (*Id.* at ¶ 7). During his time with Midfield, Plaintiff pursued a number of leadership opportunities, such as committee service (including the calendar committee) and the teacher leader academy. (*Id.* at ¶ 7). During the 2016-17 school year, Plaintiff also served as acting principal and acting assistant principal at Rutledge Middle School on occasion when the principal or assistant principal were absent. (Brown Deposition at 19-20).[5] Plaintiff served as acting principal twice (one full day, one half day) and as acting assistant principal three or four times. (*Id.* at 20, 23-24). His duties as acting principal included monitoring the halls and disciplining students as needed. (*Id.* at 21). As acting assistant principal, Plaintiff was responsible for monitoring the halls and cafeteria, ensuring students were not tardy, disciplining students as needed, and ensuring students were on the correct afternoon bus. (*Id.* at 21-23).

---

[4] Plaintiff ceased employment with SCS in July 2013, when the Alabaster school system (including Thompson High School) separated from SCS. At that time, Plaintiff automatically became employed with the Alabaster Board of Education. (Doc. # 24-4 at ¶ 6).

[5] Plaintiff's deposition transcript, referred to as the "Brown Deposition," is located in Document # 22-1. This Memorandum Opinion cites the manuscript pages of that deposition. When citing exhibits to Plaintiff's deposition, this Memorandum Opinion cites the electronically generated CM/ECF page numbers.

Plaintiff has complained about discriminatory treatment from SCS on multiple occasions prior to bringing this lawsuit. Those occasions include an EEOC charge and lawsuit in 2012 (Doc. # 1 at ¶ 19), an amended complaint adding additional charges of race discrimination and retaliation in June 2013 (*Id.* at ¶ 20), and an EEOC charge in November 2015 (*Id.* at ¶ 3) that served as the basis for the present lawsuit, which Plaintiff filed in August 2016.

### B. SCS's Hiring Procedures

When SCS needs to hire a teacher or administrator, it typically posts a notice of vacancy inviting candidates to apply online. (Doc. # 22-3 at ¶ 4). A screening panel then reviews each online application. (*Id.* at ¶¶ 5, 7). Each screening panel agrees upon filters to narrow down the pool of applicants, and the filters vary from panel to panel, depending on the position, the location, the applicant pool, and the members of the panel.[6] (*Id.* at ¶ 6; Dixon Deposition at 20-21; Miller Deposition at 10-11).[7] Screening panels typically begin by looking at each candidate's experience and general employment history. (Doc. # 22-3 at ¶ 7). If an application is incomplete or not current, or the candidate lacks a desired filter or required certification, the panel typically skips over that candidate.[8] (*Id.*) Candidates that reflect the desired experiences are flagged for closer review. (*Id.*). After the panel reviews all the applications, it focuses on the flagged names to determine who to invite for an interview. (*Id.* at ¶ 8).

---

[6] Plaintiff has submitted no evidence disputing the Board's evidence that each panel agreed on its own set of filters and that the filters could vary from panel to panel. But, as discussed more fully below, Plaintiff does argue that the Board's evidence on this issue is inconsistent with its December 2015 position statement to the EEOC. (Docs. # 23 at 5, ¶ 9; 24-5).

[7] Joel Dixon's deposition transcript, referred to as the "Dixon Deposition," is located in Document # 22-4. This Memorandum Opinion cites the manuscript pages of that deposition. James Miller's deposition transcript, referred to as the "Miller Deposition," is located in Document # 22-13. This Memorandum Opinion cites the manuscript pages of that deposition.

[8] As discussed further below, Plaintiff disputes that the Board followed this aspect of its procedures when hiring for the 2017 Oak Mountain Middle School special education teacher position.

4

An interview panel (which typically overlaps with but may not be identical to the screening panel) then interviews select candidates. (*Id.* at ¶ 10). After interviews, the interview panel comes to a consensus about who to recommend to the Superintendent. (*Id.* at ¶ 11). If interviews do not yield a consensus recommendation, a panel may review more applications, revise its filters, or simply agree not to make a recommendation, in which case SCS will not fill the position. (*Id.*). Once the panel has settled on a consensus candidate, the Superintendent makes a formal recommendation to the Board based on the panel's recommendation. (*Id.* at ¶ 12).

In recent years, for each administrative position (but not for teaching positions), Human Resources typically provides Board members with general information regarding the selection process, including the number of applicants, the number of candidates invited to interview and actually interviewed, the name of the recommended candidate, and the names of the interview panelists. (*Id.* at ¶ 13). The Board receives only the name of the recommended candidate. (*Id.*) The Board does not receive the names of unsuccessful applicants or any demographic information regarding any of the candidates. (*Id.*).

## C. The 2015 Assistant Principal Positions at Oak Mountain Middle School and Helena Middle School

In April 2015, SCS posted vacancies for assistant principal positions at Oak Mountain Middle School ("OMMS") and Helena Middle School ("HMS"). (Doc. # 22-3 at ¶ 15). For each position, SCS received more than 190 applications, including Plaintiff's. (*Id.*; Doc. # 22-5 at ¶¶ 5, 7). SCS combined the hiring processes for these positions, and the same panel screened applications and conducted interviews for both positions. (Doc. # 22-3 at ¶ 15). The screening panel first reviewed the online applications and then invited candidates to interview for the positions. (Doc. # 22-7 at ¶ 4). For external candidates, the panel members looked for formal

administrative experience (*e.g.*, work as an assistant principal or other central office administrator), while for internal candidates they looked for teacher leadership (*e.g.*, committee service, sponsoring clubs, coaching sports teams). (Docs. # 22-3 at ¶¶ 7, 17; 22-5 at ¶ 4; 22-7 at ¶ 3; 24-5 at 2). The panel members do not recall reviewing Plaintiff's application, but they acknowledge they did so because they reviewed all applications. (Docs. # 22-3 at ¶ 20; 22-5 at ¶ 7; 22-7 at ¶ 7). During the screening process, the panel did not discuss any candidate's race or age, and no one mentioned Plaintiff's prior litigation. (Doc. # 22-3 at ¶ 21).

The panel invited nineteen (19) candidates to interview, eight (8) internal and eleven (11) external. (Doc. # 22-3 at ¶ 18). Plaintiff was not among the candidates selected to be interviewed. (*Id.*).

Following the interviews, the panel unanimously recommended Caroline Gluck-Obert (white, DOB: 1983) for the OMMS position and Bakari Young (African American, DOB: 1982) for the HMS position. (Doc. # 22-3 at ¶ 22). The panel members were impressed by their prior experience, including prior middle school and assistant principal experience, as well as their performance in the interview process. (*Id.* at ¶¶ 22-23). Ms. Gluck-Obert had nine years of experience in public education, most of it at the middle school level, and had served as an assistant principal in the Jefferson County Schools for two years. (*Id.* at ¶ 22). Mr. Young had ten years of experience in public education, at both the elementary and middle school level, and had served as an assistant principal in the Jefferson County Schools for four years. (*Id.*). At the time, Plaintiff had no middle school experience and had never served as an assistant principal. (*Id.* at ¶ 23; Doc. # 22-1 at 68-69).

Based on the panel's recommendation, the Board hired Ms. Gluck-Obert and Mr. Young as the assistant principals for OMMS and HMS, respectively, on May 14, 2015. (Doc. # 22-3 at

¶ 25). When it considered the panel's recommendation, the Board members did not know the race or age of either Ms. Gluck-Obert or Mr. Young and did not know Plaintiff had applied for the position. (Docs. # 22-8 at ¶¶ 4-5; 22-9 at ¶¶ 4-5).

**D.  The 2015 Assistant Principal Position at Oak Mountain High School**

In June 2015, SCS posted a vacancy for an assistant principal position at Oak Mountain High School ("OMHS"). Around that same time, SCS had also posted an assistant principal position for Calera High School ("CHS"), so SCS combined the selection processes, using the same panel for both positions. (Doc. # 22-10 at ¶¶ 3-4). The panel reviewed over 150 applications submitted for the two positions, including Plaintiff's. (Doc. # 22-3 at ¶¶ 29, 32). For external candidates, the panel members looked for formal administrative experience (*e.g.*, work as an assistant principal or other central office administrator), while for internal candidates they looked for teacher leadership (*e.g.*, committee service, sponsoring clubs, coaching sports teams). (Dixon Deposition at 13-14; Docs. # 22-3 at ¶ 28; 22-10 at ¶ 5; 22-11 at ¶ 4; 22-12 at ¶ 4; 24-5 at 2). The panel members do not recall reviewing Plaintiff's application, but they know they did so because they reviewed all applications. (Doc. # 22-3 at ¶ 32). During the screening process, the panel did not discuss any candidate's race or age, and no one mentioned Plaintiff's prior litigation. (*Id.* at ¶ 33).

The panel invited sixteen (16) candidates to interview, three (3) internal and thirteen (13) external.[9] (Doc. # 24-5 at 4). Plaintiff was not among the candidates selected to interview. (Doc. # 22-3 at ¶ 30).

---

[9] Defendants cite evidence in their summary judgment briefing that the panel interviewed eighteen (18) candidates (fourteen (14) were external) for the OMHS assistant principal position. (Doc. # 21 at 11, ¶ 28). Plaintiff disputes this and claims that the panel interviewed sixteen (16) candidates for this position, based on the Board's 2015 EEOC position statement (Doc. # 24-5 at 4). *See* (Doc. # 23 at 7, ¶ 28). The court resolves this factual discrepancy in favor of the Plaintiff, as it is required to do on summary judgment.

Following the interviews, the panel recommended Chris Sims (African American, DOB: 1973) for the CHS position (Doc. # 22-3 at ¶ 34), and the Board ultimately hired Mr. Sims for that position (Dixon Deposition at 17-18). The Board did not at that time formally fill the OMHS position. (Doc. # 22-10 at ¶ 11). But a short time later, a current teacher at OMHS, Kyle Dudley (white, DOB: 1984), was appointed as administrative assistant of OMHS on a one-year assignment. (Doc. # 24-5 at 4). Though the parties dispute this point, Plaintiff contends that Dudley's appointment as administrative assistant was the means of filling the OMHS assistant principal position. To support this contention, Plaintiff points to an internal SCS email stating, "Kyle Dudley has [been] placed as administrative assistant at Oak Mountain High School. This is in place of hiring an assistant principal." (Doc. # 24-11 at 31). Plaintiff also points to the similar duties listed in the job descriptions for the administrative assistant and assistant principal positions. (Doc. # 24-11 at 88-91; Dudley Deposition at 57-58).[10]

Prior to being appointed administrative assistant at OMHS, Mr. Dudley had been a full-time teacher for six years at OMHS. (Dudley Deposition at 19-26). During his first three years teaching at OMHS, Mr. Dudley served as assistant coach of the OMHS baseball and cross-country teams, and during his second three years he served as head coach of the OMHS track and cross-country teams. (*Id.* at 22-26). Dudley served as administrative assistant at OMHS from July 2015 until July 2017, when he was hired as an assistant principal at OMHS. (*Id.* at 38, 52-54).

---

[10] Kyle Dudley's deposition transcript, referred to as the "Dudley Deposition," is located in Document # 24-11. This Memorandum Opinion cites the manuscript pages of that deposition.

### E.  The 2017 Special Education Teacher Position at Oak Mountain Middle School

In the summer of 2017, Larry Haynes, the principal at OMMS, sought to fill two special education teacher vacancies—a 6th grade inclusion position and a self-contained position. (Haynes Deposition at 6-7).[11] In approximately July 2017, Plaintiff applied for the self-contained position. (Brown Deposition at 96-97; Haynes Deposition at 27). Mr. Haynes reviewed applications and interviewed candidates for both positions simultaneously. (Doc. # 22-5 at ¶¶ 13, 16, 17). By the time Mr. Haynes called Mr. Brown for an interview, he had already interviewed twelve (12) candidates for these positions and offered the jobs to other candidates. (*Id.* at ¶ 15). By mid-July, however, Mr. Haynes still had not filled either position. (*Id.*).

When Mr. Haynes invited Plaintiff to interview, Plaintiff explained that although he had applied for the self-contained special education position, he had withdrawn his application because he was interested in an inclusion position. (Haynes Deposition at 26-28, 51-52; Brown Deposition at 97, 229). Mr. Haynes encouraged Plaintiff to come interview as he was trying to fill both inclusion and self-contained positions, so Plaintiff agreed to be interviewed. (Haynes Deposition at 27-28, 51; Brown Deposition at 99, 229). Mr. Haynes later testified that he doesn't "invite anybody to interview unless [he] thinks they've got good qualifications and can do a good job." (Haynes Deposition at 52).

Mr. Haynes arranged interviews for July 19, 2017, with Plaintiff, Jill Hickman, and Jennifer Nicewonder. (Doc. # 22-5 at ¶¶ 16-17). Plaintiff arrived late for his interview, so the panel proceeded to interview the two other candidates (Hickman and Nicewonder) who had already arrived for their interviews. (*Id.* at ¶¶ 18-19). When he arrived, Plaintiff said he had mistakenly gone to Mountain Brook Junior High School instead of coming to OMMS. (*Id.* at

---

[11] Larry Haynes' deposition transcript, referred to as the "Haynes Deposition," is located in Document # 22-14. This Memorandum Opinion cites the manuscript pages of that deposition.

¶ 19). This concerned the interviewers, but they proceeded with the interview. (*Id.*; Haynes Deposition at 58-59; Doc. # 22-7 at ¶ 14). The interviewers gave Plaintiff mostly "average" and "above average" interview scores. (Doc. # 22-14 at 87-90). During the interview and screening process, no one mentioned anything about Plaintiff having filed a complaint against SCS. (Docs. # 22-5 at ¶ 27; 22-7 at ¶ 19).

After interviewing all three candidates, the panel agreed that Ms. Nicewonder was the best candidate for the inclusion position and that Ms. Hickman was the best candidate for the self-contained position. (Doc. # 22-5 at ¶ 20). Mr. Haynes offered the positions to Ms. Nicewonder and Ms. Hickman, but both declined. (*Id.* at 20-21).

A few days later, on July 24, 2017, Mr. Haynes and other panel members interviewed Haley Gunnels (white, DOB: 1988) and were favorably impressed by her. (*Id.* at ¶¶ 22-24). The interviewers rated Ms. Gunnels mostly "exceptional," with a few "above average" ratings. (Doc. # 22-14 at 50-54). Based on the panel's recommendation, the Board hired Ms. Gunnels for the inclusion special education position at OMMS. (Doc. # 22-5 at ¶¶ 24, 28). The Board members did not discuss any candidate's race or age, and the Board members had no information suggesting that Plaintiff had applied for the position. (Docs. # 22-8 at ¶¶ 3, 7; 22-9 at ¶¶ 3, 7).

At the time of her hiring, Ms. Gunnels had only two years of special education teaching experience, was not yet certified to teach special education by the Alabama State Department of Education, and had not yet completed her master's degree in special education. (Haynes Deposition at 12; Docs. # 22-14 at 42-44; 24-3 at 1-2). She did, however, have a K-6 teaching certification in all subject areas, coaching experience, and experience as a technology coordinator, all of which Plaintiff lacked. (Doc. # 22-5 at ¶ 23).

Plaintiff has testified that in order to teach special education in Shelby County schools, a teacher must be certified in special education by the Alabama State Department of Education. (Doc. # 24-4 at ¶ 11). According to Plaintiff, if a teacher is not certified in special education, the teacher must have an emergency or alternative certification while the teacher is in the process of attaining the special education certification. (*Id.* at ¶ 12). Plaintiff claims he is well aware of Shelby County's policy on this issue because the policy was applied to him in the early 2000s, when Plaintiff was seeking his own special education certification. (*Id.* at ¶¶ 4, 13).

The Board disputes Plaintiff's version of SCS's policy regarding teacher certification. It claims that SCS often provides temporary contracts to special education teachers who do not have a special education certification, but who are otherwise certified teachers. (Doc. # 25-1 at ¶¶ 8-9). The Board claims that SCS adhered to its standard policy in hiring Ms. Gunnels because she was a certified teacher at the time of her hire and SCS hired her on a temporary contract, pending her certification in special education. (*Id.* at ¶ 10). According to the Board, SCS expected Ms. Gunnels to become special education certified in December 2017, upon completion of her master's program in special education. (*Id.*).

## II.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323. Once the moving party

has met its burden, Rule 56 requires the nonmoving party to go beyond the pleadings and -- by pointing to affidavits, depositions, answers to interrogatories, or admissions on file -- designate specific facts showing that there is a genuine dispute for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

III.    **Analysis**

Plaintiff has asserted claims of age discrimination, race discrimination, and retaliation against the Board based on the four hiring decisions described above. He also claims the individual Board members and Superintendent Randy Fuller engaged in race discrimination and retaliation against him in violation of 42 U.S.C. § 1981, and he has sued the individual

defendants (in both their individual and official capacities[12]) under 42 U.S.C. § 1983 for those violations.[13]

Plaintiff's age discrimination claims against the Board arise under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a). His race discrimination and retaliation claims against the Board arise under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2(a), 2000–3(a). Because Title VII race discrimination and retaliation claims and § 1981 race discrimination and retaliation claims are evaluated using the same analytical framework, Plaintiff's § 1981 claims against the individual defendants are governed by the court's analysis of his Title VII claims below. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Before discussing Plaintiff's claims against the Board, the court addresses his claims against the individual defendants. The individual defendants moved for summary judgment on all claims against them on the grounds that qualified immunity bars the claims (Doc. # 21 at 20-23), and Plaintiff failed to respond to that argument. Thus, Plaintiff has abandoned his claims against the individual defendants, *see Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009),[14]

---

[12] Because claims against the individual defendants in their official capacities are "functionally equivalent" to claims against the entity they represent, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991), those claims are governed by the court's analysis of Plaintiff's claims against the Board itself. Indeed, "there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly." *Id.*

[13] Section 1981 prohibits race discrimination and retaliation in connection with employment contracts. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (race discrimination); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454 (2008) (retaliation). But because § 1981 does not create a cause of action against state actors, 42 U.S.C. § 1983 remains "the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981." *Veasy v. Sheriff of Palm Beach Cty.*, No. 17-13174, 2018 WL 3868674, at *2 (11th Cir. Aug. 14, 2018) (citing *Butts v. Cty. of Volusia*, 222 F.3d 891, 894-95 (11th Cir. 2000).

[14] As the Eleventh Circuit explained in *Case*, "[w]hen a defendant has moved for summary judgment on the basis of qualified immunity, the plaintiff . . . must raise genuine issues of material fact to counter the defendant's summary judgment motion based on qualified immunity. Failure to do so may result in waiver or abandonment of the issue." 555 F.3d at 1329 (internal quotation marks and citations omitted); *see also Childress v. Walker*, 943 F. Supp. 2d 1332, 1349 (M.D. Ala. 2013) ("[W]hen a plaintiff files an opposition to a dispositive

and for good reason. The court's review of the Rule 56 record confirms that the individual defendants are entitled to qualified immunity. Even assuming Plaintiff has shown colorable § 1981 violations by the individual defendants, summary judgment as to them is still proper both because Plaintiff abandoned his claims against them and because there is no genuine factual dispute that the individual defendants did not violate any of Plaintiff's clearly established federal rights.[15]

### A. Plaintiff's Race and Age Discrimination Claims

A plaintiff may establish a race discrimination claim under Title VII or an age discrimination claim under the ADEA using direct or circumstantial evidence. *Standard*, 161 F.3d at 1330 (race discrimination); *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (age discrimination). Where, as here, a plaintiff offers circumstantial evidence

---

motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

[15] "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Government officials perform discretionary functions when their challenged actions fall within their job responsibilities. *See Holloman* ex rel. *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). The Board members and Superintendent Fuller were all performing a discretionary function in deciding whether to hire Plaintiff because their participation in SCS's hiring process was within their job responsibilities. *See* Ala. Code § 16-8-23 (requiring the county board of education to appoint, upon the recommendation of the county superintendent, all principals and teachers). Thus, the individual defendants can only be liable to Plaintiff under § 1983 if they violated clearly established statutory or constitutional rights or which a reasonable person would have known.

Here, the record simply does not permit an inference that the individual Defendants violated Plaintiff's rights under § 1981. That is, even assuming that others considered Plaintiff's race (and, to be clear, the Rule 56 record does not support that inference either), there is nothing to suggest that these Defendants violated Plaintiff's clearly established federal statutory rights of which a reasonable person would have known. Plaintiff has not disputed that the Board members had no information regarding the race of the recommended candidates or even the identities of the unsuccessful candidates. (Docs. # 22-8 at ¶¶ 3, 4, 5, 7; 22-9 at ¶¶ 3, 4, 5, 7). Thus, the Board members could not have had "fair warning," *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003), that their decision to ratify the Superintendent's hiring recommendations could potentially violate Plaintiff's (or anyone else's) federal rights. And, for the same reasons, Plaintiff has likewise failed to show that there exists any genuine factual dispute regarding whether Superintendent Fuller violated Plaintiff's clearly established federal rights. There is nothing in the record to suggest Superintendent Fuller knew Plaintiff's race or that Plaintiff had previously complained about discrimination at SCS. Accordingly, the individual defendants are entitled to summary judgment on all claims asserted against them in their individual capacity.

14

to prove his Title VII and ADEA claims, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to both sets of claims. *See Standard*, 161 F.3d at 1331; *Kragor*, 702 F.3d at 1308.

Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). If the plaintiff succeeds in establishing a prima facie case, "[t]he employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption" of discrimination. *Standard*, 161 F.3d at 1331. This burden involves no credibility determination, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light," *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. *Wilson*, 376 F.3d at 1087. Though plaintiff and defendant bear different burdens at various points in the analysis, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### 1. Plaintiff's Prima Facie Case

In a failure to hire case, a plaintiff may establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he was qualified and applied for the position; (3) he was rejected despite being qualified; and (4) other equally or less qualified applicants who were not members of the protected class were selected. *See Wilson*, 376 F.3d at

1089. The parties dispute whether Plaintiff can establish a prima facie case of discrimination with respect to each of the four hiring decisions at issue.

### a. The Three Assistant Principal Decisions

The court need not decide whether Plaintiff can establish a prima facie case with respect to the three assistant principal positions because, as discussed below, Plaintiff cannot establish that SCS's reasons for not hiring Plaintiff for those positions are a pretext for discrimination. But because there is a genuine factual dispute on the issue of pretext for the special education teacher position (as discussed below), the court must first address Plaintiff's prima facie case for that hiring decision.

### b. The 2017 Oak Mountain Middle School Special Education Teacher Position

SCS does not dispute that Plaintiff has satisfied the first three elements of his prima facie case with respect to the OMMS special education position. (Doc. # 21 at 19). It argues instead that no reasonable jury could find that Plaintiff has established the fourth element—that another equally or less qualified applicant who was not within Plaintiff's protected classes was selected for the position. The court disagrees. A reasonable jury could find that SCS hired an equally or less qualified applicant who was not a member of Plaintiff's protected classes for the OMMS special education position. Thus, it would be inappropriate to grant summary judgment based on Plaintiff's failure to establish a prima facie case of discrimination.

The Board hired Ms. Gunnels (white, DOB: 1988) for the inclusion special education position at OMMS in 2017. Ms. Gunnels is white and under 40, so there is no question that she is not a member of the relevant protected classes. The only question is whether she was "equally or less qualified" than Plaintiff for the position. *See Wilson*, 376 F.3d at 1089.

A reasonable jury could find that Ms. Gunnels was equally or less qualified than Plaintiff for the inclusion special education position. At the time of her hiring, Ms. Gunnels had only two years of special education teaching experience at the elementary school level, was not yet certified to teach special education by the Alabama State Department of Education, and had not yet completed her master's degree in special education. Plaintiff, by contrast, had seventeen years of special education teaching experience at both the middle and high school levels, a master's degree in special education, and was certified to teach special education. In the year prior to applying for the OMMS special education position, Plaintiff had also undertaken several leadership opportunities in the Midfield City School System, such as committee service (including the calendar committee) and the teacher leader academy. The Board claims it hired Ms. Gunnels because she possessed a K-6 teaching certification in all subject areas, coaching experience, and experience as a technology coordinator (all of which Plaintiff lacked). A reasonable jury could find that to be true. But that same jury could also find that Ms. Gunnels was nevertheless equally or less qualified for the position than Plaintiff. For summary judgment purposes, Plaintiff has established a prima facie case of race and age discrimination with respect to the hiring decision related to the special education teaching position.

## 2. SCS's Legitimate, Nondiscriminatory Reasons for Its Hiring Decisions

SCS has provided legitimate, nondiscriminatory reasons for each of its challenged hiring decisions—namely, that Plaintiff lacked the qualifications and experience SCS sought for the assistant principal positions and that the interview panel concluded Ms. Gunnels was the better candidate for the special education teacher position.

Specifically, SCS has explained that the screening panels for the three assistant principal positions looked for evidence of leadership on the applications—teacher leadership for internal

candidates and more formal administrative experience for external candidates. Because Plaintiff was an external candidate without formal administrative experience, he was not selected to interview for any of the three assistant principal positions. For the OMMS special education teacher position, SCS has explained that it valued Ms. Gunnels' teaching certification in all subjects, coaching experience, technology experience, and her exceptional interview more than it valued Plaintiff's additional years of teaching experience and special education certification. (Haynes Deposition at 12-14; Doc. # 22-7 at ¶ 18).

SCS has thus provided an explanation of its reasons for not hiring Plaintiff that is "clear and reasonably specific." *Burdine*, 450 U.S. at 258. Because these reasons having nothing to do with an applicant's race or age, the burden shifts to Plaintiff to establish that the Board's proffered reasons for its hiring decisions are merely a pretext for discrimination. *Wilson*, 376 F.3d at 1087.

### 3. Pretext

To establish pretext, Plaintiff must offer evidence from which a reasonable jury could conclude both (1) that the Board's proffered reasons for not hiring Plaintiff are false and (2) that discrimination was the real reason Plaintiff was not hired. *See St. Mary's Honor Ctr.*, 509 U.S. at 515; *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1349 (11th Cir. 2007). At summary judgment, Plaintiff may establish the first element of pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the Board's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Springer*, 509 F.3d at 1348 (internal quotation marks omitted). Plaintiff may satisfy the second element of pretext by offering direct or circumstantial evidence from which a

reasonable jury could infer that Plaintiff's race or age was the real reason he was not hired. *See Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002).

Again, as explained more fully below, as to the three assistant principal positions, Plaintiff has not offered evidence from which a reasonable jury could conclude that the Board's proffered reasons for its hiring decisions are a pretext for discrimination. Summary judgment is therefore due to be granted Defendants on Plaintiff's race and age discrimination claims arising out of the three assistant principal hiring decisions. However, as to the OMMS special education teacher position, Plaintiff has demonstrated that a genuine factual dispute exists regarding whether the Board's reasons for hiring Ms. Gunnels instead of Plaintiff are pretextual. Thus, Plaintiff's claims of age and race discrimination based on this final hiring decision are properly resolved at trial, not on summary judgment.

### a. The Three Assistant Principal Positions

The Board's proffered reason for not interviewing (and therefore not hiring) Plaintiff for the assistant principal positions is that he lacked formal administrative experience. It also notes that at the time the decision was made to interview others (but not Plaintiff) for the positions, the decisionmakers did not know Plaintiff's race or age. Nevertheless, Plaintiff argues that the Board's reason is a pretext for discrimination by pointing to certain inaccurate statements the Board made to the EEOC in 2015 when it responded to Plaintiff's initial complaints of discrimination. Plaintiff offers three claimed inconsistencies, but none of them can establish pretext.

First, Plaintiff claims the Board inaccurately described the panel screening process for assistant principal positions to the EEOC in 2015. In the Board's 2015 EEOC position statement, it described its panel screening process for assistant principal positions as follows:

The panel reviews applications looking for leadership experience, and applies a different standard to internal and external candidates. When considering external candidates, like [Plaintiff], the panel looks for formal leadership experience, specifically experience as a school level administrator (e.g., Principal, Assistant Principal, Lead Counselor, Administrative Assistant). For internal candidates, the threshold is 3-5 years of teacher leadership in their schools (e.g., serving on or chairing school committees, coaching, leading an academic department, etc.).

(Doc. # 24-5 at 1). The Board went on to state in its EEOC position statement that it did not select Plaintiff to interview for the assistant principal positions "because he had no experience as a school level administrator." (*Id.* at 3-4). Thus, the Board claims to have treated Plaintiff "like it treated any other external candidate." (*Id.* at 2).

Plaintiff claims that the Board's statements to the EEOC are inconsistent with its actual hiring practices. Plaintiff points to four other instances (not involving Plaintiff) in which the Board hired external candidates as assistant principals who lacked formal administrative experience and who also were all white and under 40.[16] In each instance, SCS hired a white external candidate under 40 into an assistant principal position directly from a teaching position, without any formal school level administrative experience. (Docs. # 24-7, 24-13, 24-14, 24-15). In this litigation, SCS has produced uncontroverted evidence that each screening panel chose its own filters and that not all screening panels uniformly required formal administrative experience of external candidates. But it has maintained -- again with uncontroverted evidence -- that the screening panels for the positions Plaintiff applied for were looking for formal administrative experience in external candidates.

Though the court recognizes that the Board's EEOC position statement may not have been fully descriptive of the panel screening process for all SCS assistant principal positions, it

---

[16] Specifically, Plaintiff points to the Board's hiring of Kendall Jackson as assistant principal of OMHS in 2014, Joshua Britnell as assistant principal of Chelsea High School in 2014, Matthew Stephens as assistant principal of Montevallo High School in 2015, and Rebecca Laney as assistant principal of Helena Intermediate School in 2016. (Docs. # 24-7, 24-13, 24-14, 24-15).

fails to see how any of the purported inaccuracies Plaintiff highlights could cause a reasonable jury to doubt the Board's stated reason for not hiring Plaintiff for the three supervisory positions at issue. Indeed, any questions about the Board's description of its hiring processes to the EEOC relate only to positions Plaintiff *did not apply for*. With respect to the three assistant principal positions at issue, the Board's EEOC position statement was entirely accurate: the screening panels for those positions looked for formal administrative experience in external candidates and ultimately filled the positions with external candidates who had formal administrative experience or internal candidates with teacher leader experience.[17] And, the undisputed fact remains that the screening panel members did not know Plaintiff's race or age when they decided not to interview him. Plaintiff has simply presented no evidence that could lead a reasonable jury to distrust the substantial Rule 56 evidence that the reason the screening panels passed over Plaintiff's application was because he lacked formal administrative experience.

Second, Plaintiff claims the Board falsely stated in its EEOC position statement that it "only invited external candidates who had [experience as a school level administrator]" to interview for the three assistant principal positions, when in fact it invited one external candidate to interview who lacked the required experience. (Doc. # 24-5 at 3-4). It is undisputed that the

---

[17] The parties dispute whether SCS in fact filled the OMHS assistant principal position in 2015. SCS maintains that the position was not filled in 2015, but Plaintiff has offered evidence from which a reasonable jury could conclude that the appointment of Kyle Dudley (white, DOB: 1984) as administrative assistant at OMHS was the means of filling the position. But even crediting Plaintiff's version of the facts, that SCS hired Mr. Dudley instead of Plaintiff raises no inference of pretext or discrimination. That is because Mr. Dudley was an internal candidate (he taught at OMHS for six years before he was appointed administrative assistant), while Plaintiff was an external candidate. For internal candidates, SCS did not require formal administrative experience but rather three to five years of teacher leader experience. (Doc. # 24-5 at 1). Mr. Dudley had that experience. He had six years of coaching experience— three years as assistant coach of the OMHS baseball and cross-country teams, and an additional three years as head coach of the OMHS track and cross-country teams. (Dudley Deposition at 22-26). Thus, even if Mr. Dudley filled the OMHS assistant principal position, he was qualified to do so under the internal-candidate standard. Plaintiff, by contrast, did not meet the qualification standard for an external candidate. Plaintiff has thus offered no evidence that SCS's reason for not considering him for the OMHS assistant principal position was false or that the real reason was discrimination.

Board invited Ms. Wilbanks,[18] an external candidate who lacked formal administrative experience, to interview for the OMMS and HMS assistant principal positions. (Doc. # 21 at 5 n.3). But SCS has shown -- and Plaintiff has not controverted -- that the reason Ms. Wilbanks was invited to interview was because she had been an exceptional teacher leader in multiple departments (*e.g.*, department chair, school accreditation committee, continuous school improvement team) and because one of the panel members strongly advocated that they interview Ms. Wilbanks. (Docs. # 22-3 at ¶ 19; 22-5 at ¶ 6; 22-7 at ¶ 5). Thus, all that Ms. Wilbanks' interview shows is that it was possible in certain unique circumstances for external candidates to gain an exception to the screening panel's general rule that only external candidates with formal administrative experience would be interviewed. But, it in no way casts doubt upon the considerable Rule 56 evidence that the screening panels passed over Plaintiff's application by applying their general rule of screening out candidates who lacked formal administrative experience and that, in any event, the panel members were unaware of Plaintiff's race, age, and prior protected activity.

Third, Plaintiff claims that the list of interviewees for the OMHS position the Board gave the EEOC in 2015 did not include Chis Sims (African American, DOB: 1973), who interviewed for the OMHS position and was ultimately hired for the CHS position. The Rule 56 record confirms Plaintiff's claim. *Compare* (Doc. # 24-9) (list of interviewees provided to EEOC, not including Chris Sims), *with* (Doc. # 22-3 at 9) (list of interviewees produced in litigation, including Chris Sims). But this inconsistency is immaterial; it casts no doubt upon SCS's stated reason as to why Plaintiff was not hired. And misstatements in an EEOC position statement that do not involve a material issue are "insufficient to support a triable issue of pretext." *Dukes v.*

---

[18] The parties refer to this individual variously as "Margaret Wilbanks" (Doc. # 21 at 5 n.3) and "Amanda Dark Wilbanks" (Doc. # 23 at 12 n.3). The court refers to her as "Ms. Wilbanks" for clarity.

*Shelby Cty. Bd. of Educ.*, No. 2:16-CV-00340-RDP, 2018 WL 925256, at *12 (N.D. Ala. Feb. 16, 2018).

Finally, and most importantly, even putting aside the question whether the Board's misstatements to the EEOC suggest that its asserted reason for not hiring Plaintiff is false, Plaintiff has presented *no* evidence -- circumstantial or otherwise -- suggesting that the real reason Plaintiff was passed over for the assistant principal positions was his race or his age. Indeed, the uncontroverted Rule 56 evidence shows that the relevant decisionmakers -- the screening panel members, the Superintendent, and the individual Board members -- had no knowledge of Plaintiff's race or age when the relevant interview and hiring decisions were made. Plaintiff has thus failed to offer evidence from which a reasonable jury could conclude that SCS's stated reason for not hiring Plaintiff is false and that discrimination based on his race or age was the real reason he was not hired. Accordingly, summary judgment is due to be granted Defendants on Plaintiff's claims of race and age discrimination arising out of the three assistant principal hiring decisions.

### b. The 2017 Special Education Teacher Position at Oak Mountain Middle School

The parties have fully briefed a separate "claim" advanced by Plaintiff—that he was the victim of discrimination in connection with the hiring of a special education teacher position at Oak Mountain Middle School. There is one problem with the presentation of that claim in the parties' summary judgment papers: that particular claim was not asserted in the judicial complaint filed by Plaintiff in this case. The parties have briefed the claim on its merits. *See* (Docs. # 20, 21, 22, 23, 24, 25, 26). Accordingly, for completeness, the court addresses the parties' arguments with the express observation that if this "claim" is to go forward, there must be an amended pleading asserting it. That is, Plaintiff may not amend his pleadings through

summary judgment briefing. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a).").

SCS's proffered reason for hiring Ms. Gunnels instead of Plaintiff for the OMMS special education position is that it valued Ms. Gunnels' teaching certification in all subjects, coaching experience, technology experience, and exceptional interview more than it valued Plaintiff's additional years of teaching experience and special education certification. But, while that may be true, Plaintiff has disputed that reason and has provided two pieces of evidence that, taken together, could cause a reasonable jury to infer that SCS's reason is in fact a pretext for discrimination. Thus, the court cannot resolve a credibility issue and credit SCS's explanation on summary judgment.

First, Plaintiff argues that his qualifications for the position were vastly superior to those of Ms. Gunnels. Plaintiff recognizes that he cannot prove pretext "by simply arguing or even by showing that he was better qualified than the [person] who received the position." *Springer*, 509 F.3d at 1349 (alteration in original). Rather, Plaintiff argues that "the disparities between [Ms. Gunnels'] and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Ms. Gunnels] over [Plaintiff]." *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks omitted).

The disparity between Ms. Gunnels' qualifications and Plaintiff's is significant. When Ms. Gunnels was selected for the OMMS special education position, she had only two years of special education teaching experience, was not yet certified to teach special education by the Alabama State Department of Education, and had not yet earned her master's degree in special

education. Plaintiff, by contrast, had seventeen years of experience as a special education teacher, was certified by Alabama to teach special education, and had completed his master's degree in special education. However, Ms. Gunnels did have a K-6 teaching certification in all subject areas, coaching experience, and experience as a technology coordinator, all of which Plaintiff lacked.

Though the disparity in qualifications is significant, it would likely be insufficient standing alone to create a triable issue of fact regarding pretext, especially given the qualities Ms. Gunnels possessed that Plaintiff lacked. But disparate qualifications is not the only evidence of pretext Plaintiff has presented.

Plaintiff also argues that SCS failed to follow its own policies in hiring Ms. Gunnels instead of him. According to Plaintiff, SCS requires its special education teachers to be certified in special education by the Alabama State Department of Education before being permitted to teach special education in Shelby County schools. He claims that if a teacher is not certified in special education, SCS requires the teacher to have an emergency or alternative certification while the teacher is in the process of attaining the special education certification. Moreover, Plaintiff has testified that he has personal knowledge of this SCS policy because the policy was applied to him in the early 2000s, when Plaintiff was seeking his own special education certification. Thus, Plaintiff argues that SCS's decision to hire Ms. Gunnels, who lacked a required certification for the position and had significantly less experience than Plaintiff, raises an inference of discrimination and creates a genuine issue of material fact that a jury must ultimately resolve.

SCS, for its part, has submitted evidence showing that it often hires special education teachers who do not have a special education certification, but who are otherwise certified

teachers, on temporary contracts. SCS argues that its decision to hire Ms. Gunnels on a temporary contract was perfectly consistent with its own policies.

The question of which policy for hiring special education teachers SCS followed here "presents a classic swearing match, which is the stuff of which jury trials are made." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). Plaintiff's testimony has created a genuine issue of material fact regarding whether SCS followed its own policy in hiring Ms. Gunnels over Plaintiff, and "[a]n employer's violation of its own normal hiring procedure may be evidence of pretext." *Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1108 (11th Cir. 2001). If it turns out to be true that SCS violated its own longstanding policy in order to hire a younger, less experienced white applicant over an older black applicant with considerably more special education experience and credentials, then a jury might reasonably infer that the hiring decision was infected with race- or age-based discrimination. Accordingly, SCS's motion for summary judgment on Plaintiff's race and age discrimination claims arising out of this particular hiring decision is due to be denied.

To proceed on this claim, Plaintiff must first amend his complaint to assert it. The Board will then be permitted to file an appropriate responsive pleading, as set out in the Order accompanying this Memorandum Opinion.

### B. Plaintiff's Retaliation Claims

Title VII makes it illegal for "an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The ADEA contains a similar anti-retaliation provision. *See* 29 U.S.C.

§ 623(d). To establish a prima facie case of retaliation under either statute, Plaintiff must prove that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected conduct. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1193-94 (11th Cir. 2016).

Here, there is no question that, at least for purposes of Rule 56, the first two elements are satisfied. Plaintiff engaged in protected activity: an EEOC charge and lawsuit in 2012, an EEOC charge in June 2013, an amended complaint in June 2013, an EEOC charge in November 2015, and the filing of his judicial complaint in this case in August 2016. And, the fact that Plaintiff was not hired into any of the positions he applied for certainly constitutes adverse employment action. But, Defendants are nevertheless entitled to summary judgment on all of Plaintiff's retaliation claims because Plaintiff has failed to establish the third element of a prima facie case (causation) for each of the challenged hiring decisions.

Plaintiff must prove his retaliation claims "according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). On summary judgment, this requires evidence from which a reasonable jury could conclude that Plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 362.

Plaintiff has presented no evidence from which a reasonable jury could infer any connection between his prior protected conduct and an adverse employment action, much less but-for causation. To begin, Plaintiff has offered no evidence that the relevant decisionmakers even knew about his prior lawsuits and EEOC complaints when they made the challenged hiring decisions. Indeed, the undisputed Rule 56 evidence shows that none of the screening or interview panel members discussed Plaintiff's prior complaints at any point during the hiring process. And, because Plaintiff was not selected to interview for the assistant principal positions, the screening

panel members for those positions did not even remember reviewing Plaintiff's application. Moreover, the Board members were not aware Plaintiff had applied for any of the positions when they ratified the Superintendent's recommendations. Because the relevant decisionmakers did not know about Plaintiff's prior protected activity, it could not have been the reason Plaintiff was not hired.

Even assuming the relevant decisionmakers knew about Plaintiff's prior complaints when the hiring decisions were made, Plaintiff still has presented no evidence that would allow a reasonable jury to infer causation. "[M]erely showing that the alleged adverse action occurred sometime after the protected expression does not establish the causation element—for temporal progression to be enough, the events must be in 'very close' proximity." *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 978 (11th Cir. 2008) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Courts have found that gaps between protected conduct and adverse employment action as small as three or four months, in the absence of other evidence tending to show causation, were insufficient to establish a prima facie case of causation. *See Breeden*, 532 U.S. at 273-74 (collecting cases); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (explaining that a three to four month delay between the protected conduct and the adverse action is enough to preclude a causal connection based solely on temporal proximity).

The time lapse between Plaintiff's previous complaints and each of the relevant hiring decisions was far in excess of three or four months. The hiring decisions for the three assistant principal positions in 2015 were made no earlier than April 2015 (the date when the first assistant principal position was posted)—more than twenty-one months after Plaintiff's most recent protected activity (*i.e.*, his amended complaint in June 2013). *See* (Doc. # 22-3 at ¶ 15) (OMMS and HMS assistant principal positions posted in April 2015); (Doc. # 22-10 at ¶ 3)

(OMHS assistant principal position posted in June 2015). Additionally, the hiring decision for the OMMS special education position was made no earlier than July 2017 (the month both Plaintiff and Ms. Gunnels were interviewed for the position)—more than ten months after Plaintiff's most recent protected activity (*i.e.*, his August 2016 Complaint in this lawsuit). *See* (Doc. # 22-5 at ¶ 13, 22) (Plaintiff and Ms. Gunnels interviewed in July 2017). In the absence of other evidence of causation -- and, to be clear, Plaintiff has offered none -- the ten and twenty-one month periods between Plaintiff's last protected activity and the Board's challenged employment actions are insufficient to establish any causal connection, much less the but-for causation standard required under *Nassar*, 570 U.S. at 362.

Plaintiff has thus failed to present Rule 56 evidence from which a jury could reasonably conclude that Plaintiff has established a prima facie case of retaliation. Accordingly, SCS is due to be granted summary judgment on all of Plaintiff's retaliation claims.

## IV.    Conclusion

For the reasons explained above, Defendants' Motion for Summary Judgment (Doc. # 20) is due to be granted in part and denied in part. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this September 21, 2018.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE